Antonio E. Gonzalez v. State of Maryland, No. 23, September Term, 2023

**IMPEACHMENT – IMMIGRATION STATUS – U VISA APPLICATION – MARYLAND RULE 5-616(a)(4) – SUFFICIENT FACTUAL FOUNDATION – PROBATIVE VALUE VERSUS DANGER OF UNDUE PREJUDICE OR CONFUSION – HARMLESS ERROR –** Supreme Court of Maryland held that trial court erred in determining that defendant failed to establish sufficient factual foundation for cross-examination of witness, who was victim of alleged assault, about witness's U visa application, which is application for visa by victims of certain crimes who have suffered mental or physical abuse and who are helpful to law enforcement or government officials in investigation or prosecution of criminal activity. Supreme Court concluded that defense counsel established sufficient factual foundation for impeachment of witness about U visa application under Maryland Rule 5-616(a)(4), where counsel demonstrated that U visa application based on witness being victim of crime that defendant was on trial for had been submitted on witness's behalf and member of State's Attorney's Office had signed certification necessary for U visa.

Supreme Court determined that issue of whether probative value of inquiry into, *i.e.,* cross-examination concerning, witness's potential bias, prejudice, interest in outcome of proceeding, or motive to testify falsely was substantially outweighed by danger of undue prejudice or confusion was not implicitly or explicitly decided by trial court and was not one of questions presented in petition for writ of *certiorari*. Supreme Court concluded that, because any error in precluding cross-examination concerning U visa application was harmless, it was not necessary to deviate from general practice of refraining from addressing issue not decided by the trial court or raised in petition for writ of *certiorari*.

Supreme Court concluded that trial court's error was harmless beyond reasonable doubt as defendant testified to committing acts that formed basis of offenses for which he was convicted, witness's testimony was consistent with another witness's testimony who was not applicant for U visa, witness's testimony was consistent with initial description of incident, and other evidence corroborated that both witnesses had been assaulted by defendant.

Circuit Court for Montgomery County
Case No. 138036C

Argued: March 5, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 23

September Term, 2023

_____

ANTONIO E. GONZALEZ

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
*Hotten
Booth
Biran
Gould
Eaves,

JJ.

_____

Opinion by Watts, J.
Gould, J., dissents.

_____

Filed: May 29, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, she also participated in the decision and adoption of this opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

Impeachment of a witness involves the practice of questioning the witness to discredit or undermine the credibility of the witness's testimony. Demonstrating that a witness is biased or may have an interest in the outcome of a proceeding, and, therefore, a motive to testify falsely, is a common technique used by trial attorneys to attempt to discredit a witness. Maryland Rule 5-616(a)(4) provides that a witness's credibility may be attacked through questions asked of the witness that are directed at "[p]roving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely[.]" Cross-examination under Maryland Rule 5-616(a)(4) "should be prohibited only if (1) there is no factual foundation for such an inquiry in the presence of the jury, or (2) the probative value of such an inquiry is substantially outweighed by the danger of undue prejudice or confusion." Manchame-Guerra v. State, 457 Md. 300, 312, 178 A.3d 1, 8 (2018) (quoting Calloway v. State, 414 Md. 616, 638, 996 A.2d 869, 881 (2010)) (emphasis omitted).

The main question presented in this case is whether a trial court erred in precluding counsel for Antonio E. Gonzalez, Petitioner, from cross-examining a witness, who was the victim of an alleged assault, about the witness's application for a U visa because the trial court found that defense counsel had failed to establish an adequate foundation for such inquiry. A U visa, which we describe in greater detail below, is a visa for noncitizens who are the victim of certain qualifying crimes and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity. See U.S. Citizenship and Immigration Services, Victims of Criminal Activity: U Nonimmigrant Status (Apr. 2, 2024), available at https://www.uscis.gov/humanitarian/victims-of-

criminal-activity-u-nonimmigrant-status [https://perma.cc/77SH-6AJE]. A U visa application is signed under penalty of perjury and submitted to the U.S. Citizenship and Immigration Services ("USCIS"), an agency of the U.S. Department of Homeland Security. See USCIS Form I-918, Petition for U Nonimmigrant Status at 1, 8, available at https://www.uscis.gov/sites/default/files/document/forms/i-918.pdf [https://perma.cc/V8AJ-XDZJ]. The application must contain a certification from an official confirming an applicant's helpfulness in the investigation or prosecution of criminal activity. See USCIS Form I-918, Supplement B, U Nonimmigrant Status Certification at 3-4, available at https://www.uscis.gov/sites/default/files/document/forms/i-918supb.pdf [https://perma.cc/Q76T-YF7L]. For a U visa to be approved, USCIS must determine, among other things, that the applicant "has been helpful, is being helpful, or is likely to be helpful" to officials investigating or prosecuting criminal activity. 8 U.S.C. § 1101(a)(15)(U)(i)(III); 8 C.F.R. § 214.14(a)(12), (b)(3), (c)(2)(ii).

In answering the main question in this case, we must address three specific issues, which are: (1) where a party seeks under Maryland Rule 5-616(a)(4) to cross-examine a witness about a U visa application, what must the party demonstrate to establish a sufficient factual foundation; (2) whether, under the circumstances of this case, defense counsel established a sufficient foundation for cross-examination of the witness in question about the submission of a U visa application; and (3) if the trial court erred in precluding cross-examination, whether the error was harmless.

According to testimony at trial, on the evening of March 13, 2020, Mr. Gonzalez

assaulted his then-wife M. and their then-12-year-old son F.[1] in their home. When Mr. Gonzalez's counsel attempted to cross-examine M. about her application for a U visa, the State, Respondent, objected. During *voir dire*, outside of the presence of the jury, M. acknowledged that she had an immigration attorney assisting her with a U visa application. When asked whether she understood that she needed to be helpful to the prosecutor to obtain a U visa, M. responded in the affirmative and stated that she would do what her immigration attorney told her to do. In response to other questions about the U visa application, M. stated that she did not understand what Mr. Gonzalez's counsel was saying or what he wanted her to say and that Mr. Gonzalez's counsel could contact her immigration attorney if he wanted more information. M. denied knowing that she would be unable to obtain a U visa if she did not cooperate with the State.

During *voir dire*, the Circuit Court for Montgomery County admitted into evidence a letter from M.'s immigration attorney to the Montgomery County State's Attorney's Office dated April 23, 2021, in which M.'s attorney advised that M. was pursuing a U visa and that, to qualify, M. needed "a certification from a law enforcement agency corroborating that she was the victim of a crime and that she was helpful to law enforcement in the investigation or prosecution of the crime." The circuit court also admitted a form titled "Supplement B, U Nonimmigrant Status Certification," USCIS Form I-918, which showed that, on August 4, 2021, the Chief of the Special Victims Division of

---

[1]To protect their identities, as the parties and the Appellate Court of Maryland did, and in accordance with Maryland Rule 8-125(b)(1), we refer to Mr. Gonzalez's former wife as "M." and their son as "F."

the Montgomery County State's Attorney's Office signed it, certifying that M. was being helpful in the investigation and prosecution of criminal activity and was "currently cooperating" with the Office.[2]

The circuit court ruled that it would not permit cross-examination of M. concerning "her immigration status" because Mr. Gonzalez's counsel had not established a "proper foundation[.]" The jury found Mr. Gonzalez guilty of two counts of second-degree assault of M. and one count of second-degree assault of F. In a split decision, the Appellate Court of Maryland affirmed the convictions. See Antonio E. Gonzalez v. State, No. 1075, Sept. Term, 2022, 2023 WL 5030170, at *14 (Md. App. Ct. Aug. 8, 2023). The Appellate Court reached two conclusions. First, the Appellate Court upheld the circuit court's determination that there was an insufficient factual foundation for cross-examination of M. about her immigration status and U visa application. See id. at *6; id. at *18 (Friedman, J., concurring). And second, the Appellate Court held that, even if the circuit court had abused its discretion in prohibiting the questioning, any error was harmless. See id. at *9; id. at *18 (Eyler, J., concurring).

In this Court, Mr. Gonzalez contends that his counsel established a sufficient factual foundation to cross-examine M. about her U visa application by proffering evidence of circumstances that demonstrated that M. had a motive to lie or embellish her testimony,

---

[2]Supplement B, U Nonimmigrant Status Certification, USCIS Form I-918 is a form that contains, among other things, a section titled "Certification" in which an official signs and, thereby, certifies a U visa applicant's helpfulness in the investigation and prosecution of criminal activity. USCIS Form I-918, Supplement B, U Nonimmigrant Status Certification at 3-4. We will, at times, refer to the form as the "supplement" or the "certification."

which, according to Mr. Gonzalez, satisfied our holding in Kazadi v. State, 467 Md. 1, 52, 223 A.3d 554, 585 (2020). Mr. Gonzalez asserts that, because the Office of the State's Attorney for Montgomery County provided M. with the certification necessary for a U visa application, there was a reasonable basis to believe that M. may have been tailoring her testimony to assist the State, and that the circuit court's preclusion of cross-examination about M.'s U visa application was not harmless error.

The State responds that Mr. Gonzalez failed to establish "'additional circumstances—such as evidence of a *quid pro quo*[3] arrangement or allegations of leniency in an immigration case'—that g[a]ve rise to a motive to testify falsely or bias" on M.'s part, as required by Kazadi, id. at 52, 223 A.3d at 585, and, therefore, failed to proffer a sufficient factual foundation to cross-examine M. about her U visa application. According to the State, Mr. Gonzalez's counsel failed to establish that M.'s initial allegation of assault was motivated by the expectation of receipt of a U visa, that M. had an agreement with the State, that she expected to receive a benefit in exchange for her testimony, or that M. understood that her application for a U visa could be affected if she did not cooperate with the State. The State also asserts that any error was harmless beyond a reasonable doubt.

We hold that the circuit court erred in precluding Mr. Gonzalez's counsel from cross-examining M. about her U visa application. We conclude that, given the nature of

---

[3]Black's Law Dictionary states that "*quid pro quo*" is Latin for "something for something" and defines the phrase as "[a]n action or thing that is exchanged for another action or thing of more or less equal value[.]" *Quid Pro Quo*, Black's Law Dictionary (11th ed. 2019).

the requirement that, for a U visa to be approved, an applicant must be helpful in the investigation or prosecution of criminal activity and provide a certification from a law enforcement or government official to that effect, a sufficient factual foundation for impeachment of a witness concerning a U visa application is established under Maryland Rule 5-616(a)(4) where there has been a showing that a U visa application, based on the witness being a victim of a crime that the defendant is charged with, has been submitted to the government for approval. Additionally, evidence that the required certification has been provided on the witness's behalf by the prosecutor's office or law enforcement official responsible for investigating or prosecuting the defendant's case is sufficient to establish the required factual foundation regardless of whether the application has been submitted by the witness. These circumstances are not intended to be exhaustive or all inclusive of the circumstances that may warrant cross-examination of a witness about a U visa application under Maryland Rule 5-616(a)(4). As with all determinations with respect to cross-examination under Maryland Rule 5-616(a)(4), a trial court must on a case-by-case basis determine whether there are circumstances that constitute an adequate factual foundation for cross-examination and, if so, whether the probative value of the cross-examination is substantially outweighed by the danger of undue prejudice.

Our holding concerning the factual foundation necessary for impeachment under Maryland Rule 5-616(a)(4) stems directly from Calloway, 414 Md. at 637, 996 A.2d at 880, in which we concluded that issues as to a witness's credibility concerning an expected benefit should be decided by the jury and not the trial court, and Manchame-Guerra, 457 Md. at 318, 178 A.3d at 11, in which we explained that the requisite factual foundation

must "be viewed from the perspective of the witness" and whether the witness could expect or hope for a benefit in exchange for testimony. (Citations omitted). Our conclusion is also consistent with our holding in Kazadi, 467 Md. at 52-53, 223 A.3d at 585, in which we concluded

> that, absent additional circumstances—such as allegations of *quid pro quo* or leniency in an immigration case giving rise to a motive to testify falsely or bias—a State's witness's status as an undocumented immigrant, or the existence of a deportation order to which the witness may be subject . . . does not show that the witness "has a motive to testify falsely[.]"

(Quoting Md. R. 5-616(a)(4)).

In this case, we conclude that Mr. Gonzalez's counsel established a sufficient factual foundation for impeachment of M. under Maryland Rule 5-616(a)(4), as his counsel demonstrated that a U visa application had been submitted on M.'s behalf on the ground that she was the victim of an assault allegedly committed by Mr. Gonzalez, that M. acknowledged that such an application had been submitted, and that M. knew that to obtain a U visa she was expected to help government and law enforcement officials in the investigation or prosecution of Mr. Gonzalez's case. Equally important, Mr. Gonzalez's counsel demonstrated that a member of the State's Attorney's Office, which was responsible for prosecuting Mr. Gonzalez, had signed the requisite certification on M.'s behalf, already bestowing a benefit by certifying that M. had been or would be helpful in the prosecution of Mr. Gonzalez. Under these circumstances, Mr. Gonzalez's counsel established an adequate factual foundation to ask questions pursuant to Maryland Rule 5-616(a)(4) aimed at uncovering whether M. had an interest in the outcome of the proceeding, or a motive to testify falsely or to embellish her testimony, either to obtain the benefit of a

U visa or retain the prosecutor's certification for the visa, and the circuit court erred in precluding cross-examination on the ground that this requirement had not been satisfied.

For the reasons discussed below, however, we hold that the error was harmless. As such, we affirm the judgment of the Appellate Court.

## BACKGROUND

### Trial

In the circuit court, the State charged Mr. Gonzalez with five offenses: one count of first-degree assault of his then-wife M., one count of second-degree physical child abuse of their son F., two counts of second-degree assault of M., and one count of second-degree assault of F. From June 14 to 17, 2022, the circuit court conducted a jury trial. At trial, as a witness for the State, through an interpreter, M. testified as follows. In 2020, M., Mr. Gonzalez, her former husband, their three children, and a tenant to whom they were renting lived together in a three-bedroom single-family house. The three children are two sons, F. and A., and one daughter, N., who, at the time of trial, were 14, 12, and 3 years old, respectively. On March 13, 2020, M. came home from work at approximately 6:00 p.m. and saw Mr. Gonzalez walking down the street with a bag of beer. Once in the house, Mr. Gonzalez came into the kitchen and M. told him: "[Y]ou're drinking again[.]" Mr. Gonzalez responded that she should not be concerned because it was his money and none of her business.

Mr. Gonzalez had left bottles of beer in the laundry room. M. took the bottles of beer to the kitchen and poured all of them out in the sink. Mr. Gonzalez came into the kitchen and said: "Son of a b[****]. Why did you pour this beer? . . . [A]re you going to

give that me that money back or are you going to give me the beer?"  Mr. Gonzalez told M.: "[Y]ou give it to me or you'll see what's going to happen to you[.]"  Mr. Gonzalez pushed M. in her chest area up against the wall.

After he pushed M., Mr. Gonzalez left the kitchen and went to the living room.  M. stayed in the kitchen for a few minutes before going to her bedroom.  Mr. Gonzalez and F. came into the bedroom.  While the three were in the bedroom, Mr. Gonzalez told F.: "I am your father.  I'll do whatever I want with you.  Not you do whatever you want with me. . . . The whole time [you] ha[ve] been meddling and intervening and today you're going to see what's going to happen [to] you."  F. "put his father up on the bed . . . [a]nd told him to calm down."

Mr. Gonzalez got up, grabbed F. by the part of his shirt near the neck, pushed him, threw him onto the bed, got on top of him, grabbed his neck with both hands, and said to F.: "[O]f all your days[,] today came. . . . You are going to see what is going to happen to you with your mom."  M. tried to pull Mr. Gonzalez off of F. and as soon as F. had "a little space, he got up."  M. told F. to go to his room, and F. left the bedroom.  Mr. Gonzalez also left the bedroom, but M. remained.

At some point, without M. hearing him, Mr. Gonzalez came back into the bedroom, came behind her and put his arm around her neck, putting her in a chokehold.  For a moment, M.'s feet did not stay on the ground because Mr. Gonzalez was holding her up and she could not breathe or talk.  Mr. Gonzalez said "your day has come today[,]" which M. took to mean that "he wanted to kill" her.

All three children came into the bedroom and F. tried, unsuccessfully, to take Mr.

Gonzalez's hands off of M.'s neck. M.'s and Mr. Gonzalez's tenant came into the bedroom and was able to get Mr. Gonzalez's arms off of M.'s neck and take Mr. Gonzalez to the living room. M. called 911, and police and fire/rescue responded to the home. Officers asked M. to write down what happened and she did so. An ambulance subsequently transported M. to a hospital for treatment of her injuries.

As a witness for the State, F., who was almost 15 years old at the time of trial, testified that, in March 2020, he had "an on-and-off relationship" with his father, Mr. Gonzalez, "where it would be very good when he was sober but it would be like quickly just flipped upside down when he wasn't[,]" which F. said was when Mr. Gonzalez was drinking. F. testified that, on March 13, 2020, Mr. Gonzalez was drinking and that, as "usual[,]" he grew "more aggressive." F. testified that, when the beers were poured out, Mr. Gonzalez grabbed him "by the arms" and F. grabbed Mr. Gonzalez's arms and "push[ed] him off[.]" Mr. Gonzalez left the kitchen.

F. was in his bedroom with his brother when he "heard scuffling" and shouting coming from his parents' bedroom, so he went to the room and saw M. "being handled by [his] dad." F. testified that he saw Mr. Gonzalez with his arms around M. F. successfully got Mr. Gonzalez "off" of M. and Mr. Gonzalez "got more aggressive towards" him. F. testified that Mr. Gonzalez grabbed his neck with his hands, which affected his breathing. Mr. Gonzalez's hands remained around F.'s neck for a "[r]elatively short" period of time before F. was able to get Mr. Gonzalez "off" of him. Mr. Gonzalez left the bedroom. During his testimony, F. identified State's Exhibits 3 and 4 as photographs of bruises on his neck on March 13, 2020 that resulted from Mr. Gonzalez's contact with him.

The following day, March 14, 2020, F.'s aunt took him to a hospital for medical treatment. F.'s emergency department medical records from Adventist HealthCare Shady Grove Medical Center were admitted into evidence as Defendant's Exhibit 8. The records indicate that F.'s "Chief Complaint" was that he had suffered "assault by strangulation by father last night." (Italics omitted). The medical records indicate F. advised that, the night before, his father had been "intoxicated" and used a "stranglehold" on him "with one hand on the right side of his neck[.]" According to the medical records, there were "[m]inor physical findings . . . on his left side of his neck[,]" and "some mild redness where [his] dad[']s hands" were.

As a witness for the State, Detective Renae McEvoy of the Rockville City Police Department testified that, on March 13, 2020, she responded to a domestic violence call involving M. While another officer and emergency medical services staff spoke with M., Detective McEvoy noticed that, when M. "would touch her neck, she would grimace[,]" and that at points she was "also holding her left arm[.]"

As a witness for the State, Najla Barton, RN, who worked as a nurse in the Forensic Medical Unit of Adventist HealthCare Shady Grove Medical Center in March 2020, was accepted as an expert in the field of forensic examinations. Nurse Barton testified that, on March 13, 2020, she conducted a forensic examination of M.[4] Nurse Barton testified that, during the exam, M. stated that she was suffering symptoms, including headache, shortness of breath, chest pain and palpitations, sore throat, abdominal pain, extremity pain, neck

---

[4]Nurse Barton's forensic examination report of M. was admitted into evidence as Defendant's Exhibit 7.

pain, and back pain. Nurse Barton testified that M.'s neck had an "area of erythema[,] which means redness not appreciated by the camera[.]" Nurse Barton identified photographs that she took of M. during the forensic examination and the photographs were admitted into evidence as State's Exhibit 6. Nurse Barton testified: "After I did my exam, I would say that [the examination] was consistent with her disclosure of what occurred[.]"

As a witness for the State, Dr. Jessica Volz,[5] the clinical director of the Forensic Medical Unit at Adventist HealthCare Shady Grove Medical Center, was accepted as an expert in the field of strangulation. Prior to testifying, Dr. Volz reviewed provider and nursing notes, the medical forensic record, photographs, lab and radiology results, and vital signs of M. for March 13-14, 2020. Dr. Volz testified that, in her opinion, M.'s injuries and symptoms were consistent with her report of strangulation.

As a witness for the defense, Dr. Wray Anthony Gerard, an emergency room physician at the Lebanon Veteran Affairs Medical Center in Lebanon, Pennsylvania, was accepted as an expert in the field of emergency medicine. Dr. Gerard testified that, based on his review of "the police charges" and the medical records for M. and F., there was "no medical evidence" that M. or F. were strangled. During Dr. Gerard's testimony, a Montgomery County Fire and Rescue Service report was admitted into evidence as Defendant's Exhibit 5.[6]

---

[5]Dr. Volz testified that she has "a bachelor's of science in nursing[,]" a "bachelor of science in behavioral science[,]" and "a doctor of nursing practice . . . with a focus on family nurse practitioner."

[6]A section of Defendant's Exhibit 5 labeled "Narrative" indicated that M.'s chief complaint was "Neck Pain/Tenderness" and that she advised that she came home and

On cross-examination, Dr. Gerard acknowledged that M.'s emergency department records from Adventist HealthCare Shady Grove Medical Center indicated that M. reported "her husband came home drinking, assaulted her multiple times by pushing her against the wall, pushing her from behind, and he held her by the neck against the walls strangling her." Dr. Gerard agreed with the prosecutor that the records indicated that M. stated "that she was strangled by her husband and hit in the head against the wall." M.'s emergency department records were admitted into evidence as Defendant's Exhibit 6.

On his own behalf, Mr. Gonzalez testified that, on March 13, 2020, he took his sons to school and went back home to make breakfast. Around 1:00 p.m. that day, M.'s sister came to the house with her two daughters, and M. and her sister left while he stayed home watching his daughter and nieces. F. came home around 3:15 p.m. and became "angry or upset" because of a smell in his bedroom. F. started yelling at Mr. Gonzalez, who "got upset, angry, and [] decided to take [F.'s] PlayStation away from him to punish him."

Around 6:00 p.m., M. came home with her sister, and she, her sister, and her sister's daughters left after dinner to go to a meeting at a church. Mr. Gonzalez stayed home because he "had hidden some beers" and started drinking. Mr. Gonzalez hid the beers because M. "would get upset" when he drank. M. returned from church around 7:15 or 7:20 p.m. During the approximately 40 minutes she had been gone, Mr. Gonzalez had

---

"found her husband intoxicated. Husband became aggressive, as he did not want to stop drinking and physically assaulted her and her oldest son. [Patient] was put in a choke hold and her head was banged against the wall." The report stated that M. had "neck pain, tenderness, and limited range of motion[,]" and that M. rated her "neck pain as a 9, on a scale of 1 to 10."

consumed three beers and decided to go for a walk and buy six more. He was going into the house with the beer while M. was parking. M. and the children saw that Mr. Gonzalez had a bag with beers, F. took the bag away, and "[t]hey poured them" out "[i]n the sink." According to Mr. Gonzalez, he did nothing in response.

Mr. Gonzalez testified that, around fifteen minutes later, when he went back into the kitchen, M. tried to hit him on the face with an open hand. He avoided being hit by grabbing M.'s hands and the two struggled. F. came in and Mr. Gonzalez grabbed F. "almost in the neck area because [he] was pushing [F.] in order . . . to be able to leave." Mr. Gonzalez testified that he was able to get away from M. and F. and went to his bedroom. When Mr. Gonzalez left the bedroom, he ran into M. in the narrow hallway and she tried to hit him. Mr. Gonzalez testified that he "pushed" M. when she tried to hit his face "because [he] wanted to get out." Mr. Gonzalez testified that he sustained marks on his neck as a result of contact between him and M. and F.[7] Mr. Gonzalez denied strangling M. or F. and denied that he intended to hurt them.

On cross-examination, Mr. Gonzalez acknowledged that he grabbed F.'s neck with one hand, and that there were two red marks on F.'s neck after he grabbed it. Mr. Gonzalez also confirmed that he pushed M. when he was in the hallway trying to leave the house. When asked how M. got the red marks on her neck that Nurse Barton saw, Mr. Gonzalez responded: "We confronted each other. We struggled."

---

[7]Mr. Gonzalez testified that M. scratched his neck while they were in the kitchen and that, when he grabbed F., F. "hit [him] on the neck."

### *Voir Dire* Concerning M.'s Immigration Status and U Visa Application

Prior to trial, the State disclosed to Mr. Gonzalez a letter dated April 23, 2021 from Manuel Rivera, Esq. to the Montgomery County State's Attorney's Office, advising that his office represented M. in immigration matters and was pursuing a U visa for M.  The State also disclosed the supplement, *i.e.*, the certification signed by a member of the State's Attorney's Office.  Information written on the supplement stated that M. and her son, F., had been assaulted and identified Mr. Gonzalez as the person responsible for the criminal activity.  In a section of the supplement titled "Part 4. Helpfulness Of The Victim," the following appeared:

1. Does the victim possess information concerning the criminal activity listed in Part 3.?  [The checkbox for "Yes" was marked.]

2. Has the victim been helpful, is the victim being helpful, or is the victim likely to be helpful in the investigation or prosecution of the criminal activity detailed above?  [The checkbox for "Yes" was marked.]

3. Since the initiation of cooperation, has the victim refused or failed to provide assistance reasonably requested in the investigation or prosecution of the criminal activity detailed above?  [The checkbox for "No" was marked.]

   If you answer "Yes" to Item Numbers 1. - 3., provide an explanation in the space below.  If you need extra space to complete this section, use the space provided in Part 7.
   Additional Information.

   [The following was typed in:] M[.] is currently cooperating with the State['s] Attorney's Office.

(Bolding omitted).  "Part 6. Certification" showed that the Chief of the Special Victims Division of the Montgomery County State's Attorney's Office signed the supplement on

August 4, 2021, under penalty of perjury, as the "Certifying Official" beneath language stating, among other things: "I further certify that if the victim unreasonably refuses to assist in the investigation or prosecution of the qualifying criminal activity of which he or she is a victim, I will notify USCIS." (Bolding omitted).

At trial, when Mr. Gonzalez's counsel asked M. about where she was born, the prosecutor objected. During *voir dire*, outside of the presence of the jury, M. indicated that she was not born in the United States and that she had an immigration attorney assisting her with an application for a U visa. During the following exchange, Mr. Gonzalez's counsel asked M. if she understood that she needed to be helpful to the prosecutor to obtain the U visa:

> [MR. GONZALEZ'S COUNSEL:] Okay. So[,] you are aware that, if you are helpful to the prosecutor, you and your family might be able to obtain a special immigration status and eventually a green card. Right?
>
> [M.:] I'm not doing this by myself. I'm doing what the attorney is telling me to.
>
> [MR. GONZALEZ'S COUNSEL:] I understand that. My question is you understand that you need to be helpful to the prosecutor for you to be able to get this U visa immigration status. Right?
>
> [M.:] With the attorney, yes. If the attorney tells me. Yes. Of course. Yes.
>
> [MR. GONZALEZ'S COUNSEL:] And on the flip of that, you also understand that if you don't -- if you refuse to cooperate with the prosecutor's office, you will not be able to get a special immigration visa?
>
> [M.:] I'm telling you the truth. I don't know what you're saying.
>
> [MR. GONZALEZ'S COUNSEL:] Okay. Let me rephrase it then. You also know that if you don't cooperate with the State's Attorney's Office, you will not be able to get -- excuse me. You will not be able to get a green card to stay in the United States?

[M.:] I'm sorry.  I don't understand.  I don't understand what you want me to say.

[MR. GONZALEZ'S COUNSEL:] I don't want you to say anything that you don't know.  I'm simply asking if you know that if you don't cooperate you won't be able to get your U visa?

[M.:] I feel like you are -- well, I don't know what you want me to answer.

[MR. GONZALEZ'S COUNSEL:] Do you know that if you do not cooperate you will not be able to get your U visa?

[M.:] I have no idea but if you want more information about that get in contact with my immigration attorney.

Mr. Gonzalez's counsel asked M.: "You are undocumented.  Correct?"  M. responded: "Yes.  I got here without any then I obtained my work permit."  Mr. Gonzalez's counsel asked M.: "For you to get a legal status in the United States, you need a U visa.  Right?"  M. responded: "I don't know if it is illegal or not. . . . If the attorney tells me that there will be[—]that I will benefit myself and my children[,] then we can do it."

During a bench conference, the circuit court asked Mr. Gonzalez's counsel whether M. had "a U visa in the works" as of March 13, 2020.  Mr. Gonzalez's counsel responded that the letter from M.'s immigration attorney was dated April 23, 2021, "a year later[,]" but argued that the question of the timing of the U visa application "goes to weight[.]"  When asked about Defendant's Exhibit 1, the letter to the State's Attorney's Office, and whether her immigration attorney had been representing her on or about April 23, 2021, M. responded that her immigration attorney had been in charge of her case since 2013.

During the following exchange, Mr. Gonzalez's counsel asked M. about Defendant's Exhibit 2, the completed supplement:

[MR. GONZALEZ'S COUNSEL:] I am showing you what is Defense Exhibit No. 2. Do you know what this document is? And you can flip through it if you need to?

[M.:] Yes. I know that. That is from the immigration.

[MR. GONZALEZ'S COUNSEL:] This is -- is it fair to say that this is a U visa application or certification is it fair to say that this is a U visa certification?

[M.:] I imagine so. As I have been telling you, I just do what the attorney tells me to do.

[MR. GONZALEZ'S COUNSEL:] And your name is on this document. Right?

[M.:] Of course.

[MR. GONZALEZ'S COUNSEL:] And your A number is on this document. Right?

[M.:] Well, it's there. That's true. I don't remember it.

[MR. GONZALEZ'S COUNSEL:] Is this a fair and accurate representation of your U visa certification?

[M.:] Okay.

[MR. GONZALEZ'S COUNSEL:] Is it? If you know?

[M.:] I do what the attorney tells me like sign this paper. I signed this paper so I imagine so.

[MR. GONZALEZ'S COUNSEL:] And you filled out this paper?

[M.:] Of course. With my attorney.

Mr. Gonzalez's counsel moved to add Defendant's Exhibits 1 and 2 to the record "for

appellate purposes[,]" and the circuit court admitted both exhibits.[8]  When Mr. Gonzalez's counsel asked M. whether she got a response from the State's Attorney's Office with respect to her application for a U visa, M. responded: "Of course.  It has been accepted and approved."

After argument by the parties, the circuit court ruled that it would "not allow any further inquiry into [M.'s] immigration status" because Mr. Gonzalez's counsel had not shown "that any inquiry regarding her immigration status would be probative of her character trait for truthfulness" and the "proper foundation ha[d] not been laid."  The circuit court determined that there was not a sufficient foundation to establish a *quid pro quo* relationship and found that M.'s testimony indicated "that she doesn't understand or doesn't know if there are any negative consequences for her failure to cooperate[.]"  The circuit court stated:

> The nexus essentially in this case arises from an alleged assault that occurred on March 13 of 2020.  The motivation to lie would have had to have begun at that point in time essentially and I have not seen anything at this point with the evidence which indicates a[] motivation to lie on her part was generated on March 13, 2020 that led to her U visa subsequently in a letter to the State's Attorney's Office more than a year later in April 2021.
>
> . . . [T]here is [] a big leap in time here . . . there is nothing showing that on March 13 o[r] March 14 that she is filing a U visa automatically saying, you know, let me use this [a]s some kind of way to get a visa so I can stay here which arguably closer in time arguably could be motivation to lie which was begun on March 13, 2020.

[8]Although M. testified that she "signed this paper," referring to the completed U visa certification (Defendant's Exhibit 2), there is no place for a U visa petitioner to sign the supplement; only the certifying official signs.  See USCIS Form I-918, Supplement B, U Nonimmigrant Status Certification at 4.  USCIS Form I-918, the U visa application, however, requires the signature of a U visa petitioner under penalty of perjury.  See USCIS Form I-918, Petition for U Nonimmigrant Status at 8.

- 19 -

So, in this case, I think [it] is just a bit too attenuated in time. I don't really believe there has been any showing quid pro quo and I don't believe there is sufficient showing of any motivation to lie which began on March 13, 2020 such that any testimony or questioning regarding her immigration status would not go to her -- address her credibility. Would not address her credibility or her motive to testify falsely or after character for witness['s] truthfulness. I don't believe the foundation has been sufficiently laid.

**Verdict and Sentencing**

The jury found Mr. Gonzalez guilty of two counts of second-degree assault of M. and one count of second-degree assault of F., but not guilty of first-degree assault of M. and second-degree physical child abuse of F. The circuit court sentenced Mr. Gonzalez to four years' imprisonment, with all but six months suspended, concurrently, as to Count 3 and 4, both second-degree assaults of M., and four years' imprisonment, with all but sixty days suspended, as to Count 5, the second-degree assault of F., to be served consecutive to the sentence imposed for Count 4. The sentence included three years of supervised probation. Mr. Gonzalez noted an appeal.

**Opinions of the Appellate Court of Maryland**

On August 8, 2023, the Appellate Court of Maryland, with the Honorable Laura S. Ripken writing for a majority of the panel, affirmed the circuit court's judgment. See Gonzalez, 2023 WL 5030170, at *14. The Appellate Court "agree[d] with the trial court that there was an insufficient factual foundation upon which to cross-examine M. about her U-Visa application and immigration status in the presence of the jury." Id. at *6. The Appellate Court explained that whether there are additional circumstances, such as evidence of a *quid pro quo* relationship between M. and the State, warranting cross-

- 20 -

examination as to bias depends on "a review of the surrounding facts and circumstances available to the trial court" and concluded that M.'s U visa application "failed to provide aid in assessing M.'s credibility as a witness." Id.

The Appellate Court reasoned that, although the circuit court did not "explicitly" balance the probative value of Mr. Gonzalez's counsel's requested line of cross-examination against the danger of undue prejudice, it was "implicit" in the record that the circuit court did so, and that it would assume that the circuit court knew the law and applied it properly. Id. at *8 n.16. On this basis, the Appellate Court concluded that the circuit court had implicitly determined that the probative value of such questioning would have been substantially outweighed by the danger of undue prejudice, and that the court did not abuse its discretion in doing so. Id. at *8.

Finally, the Appellate Court held that, even if the circuit court abused its discretion in prohibiting Mr. Gonzalez's counsel from questioning M. about her immigration status and U visa application, the error was harmless. See id. at *9. The Appellate Court explained that Mr. Gonzalez himself testified to committing acts constituting second-degree assault. See id. at *10. The Appellate Court concluded that M.'s testimony was corroborated by other evidence, such as F.'s testimony, photographs showing marks on F.'s neck, and Nurse Barton's testimony that she observed redness on M.'s neck. See id. The Appellate Court pointed out that, during closing argument, Mr. Gonzalez's counsel argued that M. and F. both consented to contact with Mr. Gonzalez by participating in the incident, but Mr. Gonzalez never testified to being fearful of M. or F. or even that he believed he was involved in a "mutual affray" with them. Id. For these reasons, the

- 21 -

Appellate Court was "convinced beyond a reasonable doubt that, had the court abused its discretion in barring [Mr.] Gonzalez from raising M.'s U-Visa application and immigration status, the error would not have influenced the jury's verdict." Id.

The Honorable Deborah S. Eyler and the Honorable Daniel A. Friedman each issued a concurring opinion. See id. at *14 (Eyler, J., concurring), *18 (Friedman, J., concurring).[9] Judge Eyler explained that, in her view, based on the letter from M.'s immigration attorney and the U visa certification signed by a member of the State's Attorney's Office, there was an adequate factual foundation under Maryland Rule 5-616(a)(4) for cross-examination of M. about her immigration status and U visa application, but agreed that any error was harmless beyond a reasonable doubt. See Gonzalez, 2023 WL 5030170, at *14-*16 (Eyler, J., concurring). Judge Eyler pointed out that, "to succeed in obtaining and keeping a U-Visa, which would be to M.'s benefit, she would have to cooperate in the prosecution of the case against [Mr. Gonzalez], which only could happen if she testified against him." Id. at *16 (Eyler, J., concurring). Judge Eyler explained that M., therefore, "had a motive to testify that [Mr. Gonzalez] committed the acts underlying the criminal charges, even if he did not." Id. (Eyler, J., concurring).[10] Judge Eyler,

_____

[9]The concurring opinions show that one majority of the panel (Judge Ripken and Judge Friedman) concluded that there was an insufficient factual foundation for cross-examination of M. concerning her U visa application. See Gonzalez, 2023 WL 5030170, at *6; id. at *18 (Friedman, J., concurring). A different majority of the panel (Judge Ripken and Judge Eyler) concluded that any error by the circuit court in precluding cross-examination of M. was harmless. See id. at *9-*10; id. at *18 (Eyler, J., concurring).

[10]Judge Eyler also concluded that the circuit court did not find that the probative value of the cross-examination would have been substantially outweighed by the danger of undue prejudice or confusion and that, if it had, the circuit court would have abused its discretion in doing so. See Gonzalez, 2023 WL 5030170, at *17 (Eyler, J., concurring).

however, concluded that the circuit court's error was harmless given that Mr. Gonzalez had acknowledged committing acts that constituted second-degree assaults and that the jury found him not guilty of first-degree assault and second-degree physical child abuse. See Gonzalez, 2023 WL 5030170, at *18 (Eyler, J., concurring).

Judge Friedman agreed that Mr. Gonzalez's counsel failed to establish a sufficient factual foundation for cross-examining M. about her U visa application, but pointed out that a different trial judge may have permitted the requested cross-examination and that, in his view, under the applicable standard of review, doing so would not have been an abuse of discretion. See id. at *18 (Friedman, J., concurring). Judge Friedman explained that, in light of the holding that there was no sufficient factual foundation, it was not necessary to reach the question of whether the proposed cross-examination "was more probative than prejudicial" and that he would not have addressed the issue of harmless error because he did not agree that M.'s credibility "was unimportant in relation to everything else the jury considered." Id. (Friedman, J., concurring) (cleaned up).[11]

**Petition for a Writ of *Certiorari***

On September 19, 2023, Mr. Gonzalez petitioned for a writ of *certiorari*, which we granted, raising the following three issues:

> 1. When seeking to cross-examine a witness about their submission of and/or interest in applying for a U-Visa—which is available to people "who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of

---

[11]In addition, the Appellate Court concluded that the circuit court did not abuse its discretion in declining to remove a prospective juror or in limiting Mr. Gonzalez's closing argument. See Gonzalez, 2023 WL 5030170, at *10, *12; id. at *14 n.2 (Eyler, J., concurring); id. at *18 (Friedman, J., concurring). Neither issue is before this Court.

- 23 -

criminal activity"—what must trial counsel proffer to satisfy Md. Rule 5-614(a)(4) and this Court's holding in *Kazadi v. State*, 461 Md. 1 (2020)?

2. Did a majority of the Appellate Court err in holding that defense counsel proffered an insufficient basis for cross-examining a witness for the State about her submission of a U-Visa application, even though defense counsel, *inter alia*, proffered (1) a copy of a letter from the witness' immigration attorney asking the State's Attorney's Office ("SAO") to provide "certification" that the witness "was the victim of a crime and that she was helpful to law enforcement in the investigation or prosecution of" Petitioner and (2) a copy of the requisite federal form filled out by the SAO indicating that the witness had been "cooperating" with law enforcement regarding Petitioner's prosecution?

3. Did a majority of the Appellate Court err in holding that any error was harmless even though the relevant witness' credibility was a central issue in the case and even though Petitioner testified that, during the altercation, he touched the complaining witnesses only to protect himself?

See Gonzalez v. State, 486 Md. 216, 305 A.3d 853 (2023).

## DISCUSSION

## The U Visa

"In October 2000, Congress created the U-visa as part of the Victims of Trafficking and Violence Protection Act of 2000 ('the Act'), Pub. L. No. 106-386, Div. A, 114 Stat. 1464 (2000), codified at *inter alia*, 8 U.S.C. § 1101(a)(15)(U)." Calderon-Ramirez v. McCament, 877 F.3d 272, 274 (7th Cir. 2017). The Act created a new visa classification that permits noncitizens "who are victims of serious crimes and who assist law enforcement to apply for and receive a nonimmigrant visa called a U-visa." Id. (citation omitted).[12] For a petitioner to qualify for a U visa, the Secretary of Homeland Security must determine

---

[12]A nonimmigrant is a foreign national who enters the United States on a temporary basis for work, study, tourism, or other reasons. See USCIS, Glossary, https://www.uscis.gov/tools/glossary [https://perma.cc/C3GD-AEZA].

- 24 -

that: (1) the petitioner "has suffered substantial physical or mental abuse as a result of having been a victim" of qualifying criminal activity;[13] (2) the petitioner "possesses information concerning [the] criminal activity"; (3) the petitioner "has been helpful, is being helpful, or is likely to be helpful" to government officials investigating or prosecuting the criminal activity; and (4) the criminal activity at issue violated the laws of the United States or occurred in the United States or the territories and possessions of the United States. 8 U.S.C. § 1101(a)(15)(U)(i)(I-IV).

"Department of Homeland Security (DHS) regulations give USCIS sole jurisdiction over U-visa petitions." J.M.O. v. United States, 3 F.4th 1061, 1062 (8th Cir. 2021) (citation omitted). As such, USCIS decides whether to approve or deny a petition. See 8 C.F.R. § 214.14(c)(5).[14] To petition for a U visa, a petitioner submits Form I-918 (Petition for U Nonimmigrant Status) to USCIS, which is a division of DHS. See USCIS Form I-918, Petition for U Nonimmigrant Status at 1. The form requires petitioners to fill out information about themselves, a spouse, and/or their children and must be signed and dated by the petitioner under penalty of perjury. See id. at 1, 7-8.[15]

---

[13]Qualifying criminal activity includes the commission of or an attempt, conspiracy, or solicitation to commit crimes such as domestic violence, felonious assault, abusive sexual contact, sexual assault, stalking, and others. See 8 U.S.C. 1101(a)(15)(U)(iii).

[14]"Congress enacted a statutory cap of 10,000 U-visas each fiscal year." Calderon-Ramirez, 877 F.3d at 274 (citing 8 U.S.C. § 1184(p)(2)(A)). As a result, "a waiting list exists for petitioners seeking adjudication" and there are "two separate waiting periods and two adjudications for each petitioner—one for placement on the waiting list and one to receive a U-visa." Id. (citation omitted).

[15]Form I-918, Supplement A (Petition for Qualifying Family Member of U-1 Recipient) is a form that a petitioner fills out with information about any qualifying family member included in the petition. See USCIS Form I-918, Supplement A, Petition for

A petitioner must also submit Supplement B. See USCIS Form I-918, Supplement B, U Nonimmigrant Status Certification at 1. Supplement B includes a certification, "which confirms that the petitioner has been helpful, is being helpful, or is likely to be helpful in the investigation or prosecution of the qualifying criminal activity of which he or she is a victim." 8 C.F.R. § 214.14(a)(12). Supplement B must be "signed by a certifying official within the six months immediately preceding the filing of Form I-918." 8 C.F.R. § 214.14(c)(2)(i). Under 8 C.F.R. § 214.14(a)(3)(i) and (ii), the "certifying official" must be "[t]he head of the certifying agency, or any person(s) in a supervisory role who has been specifically designated by the head of the certifying agency to issue U nonimmigrant status certifications on behalf of that agency" or "[a] Federal, State, or local judge." The "certifying agency" must be "a Federal, State, or local law enforcement agency, prosecutor, judge, or other authority, that has responsibility for the investigation or prosecution of a qualifying crime or criminal activity." 8 C.F.R. § 214.14(a)(2).

Among the requirements for eligibility to obtain a U visa is that, "since the initiation of cooperation, [the petitioner] has not refused or failed to provide information and assistance reasonably requested." 8 C.F.R. § 214.14(b)(3). A certifying official is required to notify USCIS if a petitioner refuses or fails to provide aid when reasonably expected. See id.

It can easily be seen that a U visa provides a noncitizen and the person's family substantial benefits. If a U visa "petition is approved, a petitioner present in the United

Qualifying Family Member of U-1 Recipient at 1, available at https://www.uscis.gov/sites/default/files/document/forms/i-918supa.pdf [https://perma.cc/5FJ2-C3V9].

States receives lawful nonimmigrant status and employment authorization for up to four years." J.M.O., 3 F.4th at 1062 (citations omitted). There is an opportunity to extend the four-year period upon attestation by the certifying official that the petitioner's presence in the United States continues to be necessary to assist in the investigation or prosecution of qualifying criminal activity. See 8 C.F.R. § 214.14(g)(2)(ii). Once a petitioner who has been granted U nonimmigrant status has continuously been physically present in the United States for at least three years following receipt of a U visa, the petitioner is eligible to apply for lawful permanent residency. See 8 U.S.C. § 1255(m)(1)(A). In other words, the Secretary of Homeland Security has the authority to convert a petitioner's status from lawful U nonimmigrant to lawful permanent resident. See J.M.O., 3 F.4th at 1062. And, even petitioners who apply for a U visa and are placed on the waiting list receive a benefit because USCIS "will grant eligible petitioners and qualifying family members on the waiting list deferred action [as to removal] and work authorization while they wait for final adjudication." Calderon-Ramirez, 877 F.3d at 274 (citing 8 C.F.R. § 214.14(d)(2)).

All of these benefits may be revoked if an applicant fails to assist law enforcement in the investigation and prosecution of criminal activity. USCIS may revoke an approved petition after giving notice of intent to revoke if "[t]he certifying official withdraws the U nonimmigrant status certification [*i.e.*, Supplement B] or disavows the contents in writing[.]" 8 C.F.R. § 214.14(h)(2)(i)(A).

### Maryland Rule 5-616(a)(4) and Relevant Case Law

"An appellate court reviews without deference a trial court's restriction of cross-examination where that restriction is based on the trial court's understanding of the legal

rules that may limit particular questions or areas of inquiry." Kazadi, 467 Md. at 49, 223 A.3d at 582-83 (cleaned up). "An appellate court reviews de novo a trial court's determination as to whether evidence is relevant." Portillo Funes v. State, 469 Md. 438, 478, 230 A.3d 121, 144 (2020) (citation omitted).

Maryland Rule 5-616(a) addresses impeachment by inquiry of a witness and provides, in relevant part: "The credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at: . . . (4) Proving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely[.]" On more than one occasion, we have held that,

> when the trier of fact is a jury, questions permitted by Rule 5-616(a)(4) should be prohibited only if (1) there is no factual foundation for such an inquiry in the presence of the jury, or (2) the probative value of such an inquiry is substantially outweighed by the danger of undue prejudice or confusion.

Manchame-Guerra, 457 Md. at 312, 178 A.3d at 8 (cleaned up).

A sufficient factual foundation may be established through circumstantial or direct evidence and issues concerning a witness's credibility as to an expectation of a benefit are for the trier of fact to determine. Our holdings in Calloway, Manchame-Guerra, and Martinez v. State, 416 Md. 418, 7 A.3d 56 (2010) demonstrate these points. In Calloway, 414 Md. at 619, 639, 996 A.2d at 870, 881-82, a case in which the defendant's former cellmate called the Montgomery County State's Attorney's Office and offered to testify about inculpatory statements the defendant allegedly made to him, we held that "there was a solid factual foundation for an inquiry into [the witness's] self interest, and the circumstantial evidence of [the witness's] self interest was not outweighed—substantially

or otherwise—by the danger of confusion and/or unfair prejudice to the State." (Emphasis omitted). At the time that the witness offered to provide information, he was awaiting trial on charges of second-degree assault and reckless endangerment, facing a violation of probation as a result of a guilty plea he entered in another matter, and had been unable to post bail. See id. at 619, 996 A.2d at 870. In between the call to the State's Attorney's Office and the defendant's trial, the witness was released from custody, the State nolle prossed the pending charges, and no violation of probation charges were filed against the witness. See id. at 637, 996 A.2d at 880.

The State filed a motion *in limine* to prohibit defense counsel from cross-examining the witness about whether he had volunteered to testify in the hope of receiving a benefit from the State. See id. at 619, 996 A.2d at 870. At a hearing on the motion, the witness acknowledged that he had pending charges and was incarcerated when he called the prosecutor, but testified that he did not expect to receive any benefit from the State by talking about the defendant. See id. at 624-25, 996 A.2d at 873. The trial court granted the State's motion *in limine*, finding the witness to be credible. See id. at 631, 996 A.2d at 877.

We held that the trial court committed reversible error. See id. at 620, 996 A.2d at 870-71. We concluded that issues concerning the witness's credibility, *i.e.*, whether the witness made the call to the State's Attorney's Office "in the hope of being released from detention, and whether he was testifying at trial in the hope of avoiding a violation of probation charge, should have been decided by the jury rather than by the [trial c]ourt." Id. at 637, 996 A.2d at 880. We stressed that the issue was whether the witness "had a hope

that he would benefit from volunteering to testify against [the defendant.]" Id. at 637, 996

A.2d at 880-81. We explained that it was "of no consequence" that the State had not

entered into an agreement with the witness in exchange for testimony or that the witness's

testimony before the jury would be consistent with his testimony at the hearing. Id. at 637,

996 A.2d at 881. Quoting the Appellate Court in Leeks v. State, 110 Md. App. 543, 557,

678 A.2d 80, 87 (1996), we stated that

> [t]he issue of bias is often generated by circumstantial evidence, and does not
> disappear merely because the witness denies any reason to be biased. If such
> circumstantial evidence exists, the trier of fact is entitled to observe the
> witness's demeanor as he or she responds to questions permitted by Rule 5-
> 616(a)(4).

Calloway, 414 Md. at 638, 996 A.2d at 881 (emphasis omitted). Because we could not

determine that the trial court's error was harmless beyond a reasonable doubt, we

concluded that the defendant was entitled to a new trial at which the issue of the witness's

motive to testify falsely would be decided by the jury. See id. at 639, 996 A.2d at 882.[16]

Shortly after Calloway, in Martinez, 416 Md. at 420, 7 A.3d at 57, a case involving

charges of murder and attempted murder, we held that the trial court erred in precluding

---

[16]In Calloway, 414 Md. at 638, 996 A.2d at 881, we also held that, to the extent our
analysis was inconsistent with that of Ebb v. State, 341 Md. 578, 671 A.2d 974 (1996) and
Watkins v. State, 328 Md. 95, 613 A.2d 379 (1992), those cases were overruled. In
Watkins, 328 Md. at 103, 613 A.2d at 382-83, we held that a trial court did not abuse its
discretion in precluding cross-examination of State's witnesses concerning whether they
were on probation where the trial court determined that the evidence had limited probative
value that "was outweighed by other appropriate considerations." In Ebb, 341 Md. at 590,
671 A.2d at 980, we held that a trial court did not abuse its discretion in precluding cross-
examination of State's witnesses concerning whether they had charges pending against
them at the time of their testimony where the witnesses denied expecting to receive
leniency. After Calloway, these holdings were no longer good law.

cross-examination of a witness about the State's dismissal of the witness's pending charges. The State had dismissed the pending charges six days before the witness testified at a hearing in the defendant's case, and the witness had been incarcerated at the time on a writ of body attachment pending testimony in the case. See id. at 431, 7 A.3d at 63. We concluded that these events constituted "circumstantial evidence of bias, motivated by self-interest[,]" and provided a sufficient factual foundation for cross-examination under Maryland Rule 5-616(a)(4). Id. at 431, 7 A.3d at 63.

In Manchame-Guerra, 457 Md. at 319-20, 178 A.3d at 12-13, a case involving a defendant charged with first-degree murder and second-degree murder, a witness for the State testified that he saw the defendant shoot the victim and we held that the trial court erred in precluding defense counsel from cross-examining the witness about pending charges. We concluded that, although there was no direct evidence that the witness had a motive to testify falsely, such as an agreement between the witness and the State, the defendant proffered sufficient circumstantial evidence that, viewed from the witness's perspective, could have led the witness to expect or hope for a benefit in exchange for his testimony. See id. at 319-20, 178 A.3d at 12-13. We explained that our case law does not require direct evidence to satisfy the requisite factual foundation for inquiry under Maryland Rule 5-616(a)(4). See id. at 320, 178 A.3d at 13. Quoting Calloway, 414 Md. at 638, 996 A.2d at 881, we reiterated that circumstantial evidence of a witness's bias or self-interest is admissible and that the "trier of fact is entitled to observe the witness's demeanor as he or she responds to questions permitted by Rule 5-616(a)(4)." Manchame-Guerra, 457 Md. at 313-14, 178 A.3d at 8-9 (emphasis omitted).

We counseled that a "proffer is to be viewed from the perspective of the witness: i.e., the witness's expectation or hope for a benefit in return for testimony favorable to the prosecution[,]" and that the trial court "must allow a defendant wide latitude to cross-examine a witness as to bias or prejudices." Id. at 318-19, 178 A.3d at 11-12 (cleaned up). We noted that the defendant's proffer included that the witness's charges were pending in the same county where the defendant was standing trial and that the charges had been pending for eighteen months at the time of the defendant's trial. See id. at 321, 178 A.3d at 13.[17] We held that the trial court erred in denying defense counsel the opportunity to cross-examine the witness pursuant to Maryland Rule 5-616(a)(4) as to whether he had a motive to testify falsely, and we observed that, "to its credit," the State did not argue that the error was harmless. Manchame-Guerra, 457 Md. at 322, 178 A.3d at 14.

Although the facts of Calloway, Martinez, and Manchame-Guerra did not involve impeachment of a witness concerning the witness's immigration status or application for a U visa, the principles set forth in those cases are equally applicable to impeachment concerning a U visa application under Maryland Rule 5-616(a)(4).

**Kazadi**

We are unaware of any reported Maryland opinion in which either this Court or the Appellate Court has addressed an issue concerning cross-examination of a witness under

---

[17]We pointed out that the State did not contest that the probative value was not substantially outweighed by the danger of undue prejudice or confusion. See Manchame-Guerra, 457 Md. at 321-22, 178 A.3d at 13.

Maryland Rule 5-616(a)(4) based on a witness's U visa application.[18] In Kazadi, 467 Md. at 48-54, 223 A.3d at 582-85, this Court addressed whether the State was required to disclose during discovery information about a witness's immigration status and the circumstances under which cross-examination of a State's witness concerning the witness's immigration status might occur.[19]

In Kazadi, 467 Md. at 53, 223 A.3d at 585, we concluded that the trial court did not err in denying a motion to compel the State to disclose a witness's, S.L.'s, Alien Registration Number, immigration case number, and a copy of a deportation order to which the witness was subject. The defendant had been charged with first-degree murder, use of a firearm during commission of a crime of violence or felony, and wearing, carrying, or transporting a handgun. See id. at 8, 223 A.3d at 558. Before trial, the defendant's counsel

[18]In Carrero-Vasquez v. State, 210 Md. App. 504, 508-09, 63 A.3d 647, 650 (2013), a case in which the defendant was charged with offenses related to a stolen handgun that had been found in a car, the Appellate Court held that the trial court erred in precluding cross-examination of a State's witness, who was the owner of the car, about the witness's immigration status. The witness had acknowledged being an undocumented immigrant and that being convicted of possessing a stolen handgun would be grounds for deportation. See id. at 516, 63 A.3d at 654. There was no indication that the witness had applied for a U visa.

[19]Cross-examination concerning a witness's immigration status and a U visa application, while related, involve different inquiries. "'[I]mmigration status' is a term of art generally used to describe a person's lawful or unlawful presence in the United States." Miguleva v. Wash. State Dep't of Nat. Res., 670 F. Supp. 3d 1173, 1180 (E.D. Wash. 2023) (citation omitted). An "undocumented immigrant is an immigrant without any valid documentation or lawful immigration status." Tara Kennedy, Barred from Practice? Undocumented Immigrants and Bar Admissions, 63 DePaul L. Rev. 833, 838 (2014) (cleaned up). A U visa allows noncitizens who are the victims of certain qualifying crimes to live and work in the United States. In this case, the record is unclear as to whether M. was undocumented at the time of the alleged assault or trial. The issue of cross-examination concerning M.'s lawful or unlawful presence in the United States was not raised as one of the questions presented in the petition for a writ of *certiorari*.

filed a motion to compel discovery seeking the Alien Registration Number, immigration

case number, and immigration-related paperwork for S.L., who, according to the defendant,

was subject to a deportation order along with her son, M.L., who was also a witness for the

State. See id. at 10-11, 223 A.3d at 560. The defendant argued that the deportation order

gave S.L. and M.L. "a motive to testify against" him, "in that their testimony could make

them eligible for relief from deportation." Id. at 11, 223 A.3d at 560. The State opposed

the motion and filed a motion *in limine* to preclude the defendant from cross-examination

about S.L.'s immigration status. Id. at 11, 223 A.3d at 560.

The trial court denied the defendant's motion to compel and granted the State's

motion *in limine*, ruling that the defendant failed to show a "'special relationship' between

S.L. and the State as to immigration, or a promise, inducement, or benefit that the State

extended concerning immigration[.]" Id. at 11-12, 15, 223 A.3d at 560, 563. The question

before this Court was "whether, during discovery, a prosecutor must disclose immigration-

related information concerning a State's witness who is an undocumented immigrant, and

whether a defendant may cross-examine such a witness concerning his or her immigration

status." Id. at 7, 223 A.3d at 558.[20] We concluded:

> [A]bsent additional circumstances—such as allegations of *quid pro quo* or
> leniency in an immigration case giving rise to a motive to testify falsely or
> bias—a State's witness's status as an undocumented immigrant, or the
> existence of a deportation order to which the witness may be subject does not
> "show the character of the witness for untruthfulness[,]" Md. R. 4-
> 263(d)(6)(A), is not "probative of a character trait of untruthfulness[,]" Md.
> R. 5-608(b), and does not show that the witness "has a motive to testify

---

[20]Although we resolved the case on an unrelated issue concerning *voir dire*, we addressed "the issues as to immigration-related information because they [were] likely to recur at trial." Kazadi, 467 Md. at 48 n.14, 223 A.3d at 582 n.14.

falsely[,]" Md. R. 5-616(a)(4).  Without more, a State's witness's status as an undocumented immigrant, or any deportation order to which the person is subject, is not required to be disclosed by a prosecutor during discovery, and is not a proper subject of cross-examination.

Kazadi, 467 Md. at 52-53, 223 A.3d at 585.  We explained that, "[g]enerally, a witness's immigration status is not relevant to his or her credibility because, absent additional circumstances, a witness's status as an undocumented immigrant, or the existence of a deportation order to which the witness may be subject, does not make the witness any more likely to falsely testify than any person would be."  Id. at 53, 223 A.3d at 585. "[I]mmigration status alone does not reflect upon an individual's character, and is thus not admissible for impeachment purposes."  Id. at 53, 223 A.3d at 585 (cleaned up).

In upholding the trial court's ruling precluding cross-examination of the witnesses about their immigration status, we stated:

> There is no evidence of any *quid pro quo* or leniency in any immigration matter involving S.L. or M.L.  There is no indication that any of the immigration-related information that [the defendant] requested would "show the character of S.L. for untruthfulness."  Md. R. 4-263(d)(6)(A).  Because there was no evidence that S.L.'s or M.L.'s immigration status, or the deportation order, reflected on their credibility, disclosure of the requested documents was not required and cross-examination regarding the same was not permitted.

Id. at 53-54, 223 A.3d at 585 (brackets omitted).

**Use of the U Visa for Impeachment Purposes: Other Jurisdictions**

Other jurisdictions have addressed cross-examination of a witness about a U visa application, *i.e.,* use of the U visa for impeachment purposes.  Appellate courts in Oregon and Kentucky and the Supreme Courts of South Dakota, Vermont, and Connecticut have held that trial courts erred in precluding cross-examination of witnesses concerning a U

visa application, while Courts of Appeal of Arizona and California have reached a different conclusion.

In some jurisdictions, the threshold for establishing a sufficient factual foundation to impeach a witness through cross-examination about a U visa application is a relatively low bar. For instance, in State v. Valle, 298 P.3d 1237, 1239 (Or. Ct. App. 2013), the Court of Appeals of Oregon concluded that the trial court erred in precluding cross-examination of a witness about the fact that the witness had applied for a U visa and that the error was not harmless. The Court explained that there is a sufficient factual foundation for the admission of evidence to impeach a witness "if the party shows that the evidence could support a reasonable inference that the witness is biased or self-interested" and "the only question is whether a jury could find that the witness has a motive to testify in a certain manner." Id. at 1243. The Court stated that, where a witness has applied for a U visa on the ground that the witness is the victim of a crime, a defendant need only show that the circumstances are such that a jury could reasonably infer that the witness "had a personal interest in testifying in a manner consistent with her application" to secure a U visa. Id. at 1243. The defendant is not required to show that the victim believed that her eligibility for a U visa was dependent on her testimony or that there was an established *quid pro quo* relationship. See id. at 1244-45.

Later, in State v. Del Real-Galvez, 346 P.3d 1289, 1293 (Or. Ct. App. 2015), in reviewing whether a trial court erred in excluding evidence that a witness's mother had applied for a U visa based on the offense at issue, the Court of Appeals of Oregon held that "all [the] defendant had to do"—which the defendant did—was "lay a sufficient foundation

. . . that the evidence was relevant, and, to do that, all he had to show was that the evidence had a tendency, however slight, to demonstrate that [the witness] had a personal interest in testifying against him." (Quoting Valle, 298 P.3d at 1243). The Court held that it was not necessary for the defendant to show that the witness "knew or believed that her mother would submit a U visa application if [the witness] accused [the] defendant of sexual abuse." Id.

Similarly, in Romero-Perez v. Commonwealth, 492 S.W.3d 902, 903 (Ky. Ct. App. 2016), the Court of Appeals of Kentucky held that the trial court erred in precluding defense counsel from cross-examining a witness, who was an alleged victim of burglary and domestic assault, about a pending U visa application. The Court of Appeals stated:

> One can readily see how the U-Visa program's requirement of "helpfulness" and "assistance" by the victim to the prosecution could create an incentive to victims hoping to have their U-Visa's [sic] granted. Even if the victim did not outright fabricate the allegations against the defendant, the structure of the program could cause a victim to embellish her testimony in the hopes of being as "helpful" as possible to the prosecution.

Id. at 906 (citation omitted). The Court explained that "[t]he ability to transform oneself from illegal immigrant, to legal visa holder, to permanent legal resident in a relatively short amount of time without ever having to the leave the United States, *could* provide a strong motive for fabrication or embellishment." Id. at 907 (emphasis in original). The Court stated: "While some prejudice might result from allowing examination into the U-Visa application, we believe a criminal defendant's constitutional right to confront his accuser must prevail in this instance." Id. at 906. The Court concluded that "the improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause

errors, is subject to harmless-error analysis[,]" and that, given the overwhelming evidence of guilt, the error was harmless beyond a reasonable doubt. Id. at 907-08 (cleaned up).

In State v. Dickerson, 973 N.W.2d 249, 252-53 (S.D. 2022), the Supreme Court of South Dakota held that a trial court erred in granting the State's motion *in limine* and precluding any reference to a witness's immigration status, including the circumstance that an attorney told the witness that, if the witness continued to cooperate with the investigation, the witness could apply for a U visa. After explaining that it had not previously addressed whether "a witness's immigration status or efforts to obtain a U-Visa may be admissible to show motive to testify in a certain manner[,]" the Supreme Court discussed Romero-Perez and Valle as examples of cases in which other courts had determined that a trial court erred in precluding cross-examination concerning a witness's U visa application. Dickerson, 973 N.W.2d at 259-60 (footnote omitted). The Supreme Court concluded that the defendants had a right to inquire into any possible motives influencing the witness's testimony, including whether the witness knew of the U visa program but had not yet applied, as that provided a basis to show that the witness "had an incentive to embellish or exaggerate his testimony against [the defendants] in order to be perceived as the victim[.]" Id. at 261.[21]

And, in State v. Juan A. G.-P., 287 A.3d 1060, 1082 (Conn. 2023), the Supreme Court of Connecticut held that a sufficient factual foundation for the admission of

---

[21]In Dickerson, 973 N.W.2d at 264, the Court held that the State had not demonstrated that the trial court's error was harmless beyond a reasonable doubt, as there was no evidence corroborating the witness's testimony and the State's case primarily depended on whether the jury accepted the witness's version of events.

impeachment evidence is established where a defendant shows that the proposed evidence is relevant to a witness's motive to testify in a certain manner. The Supreme Court explained that U visa applications were "prototypical impeachment evidence showing that a witness was promised or stood to gain some type of benefit from the government in return for his or her cooperation." Id. at 1081 (citations omitted). The Supreme Court pointed out that it is for the jury to believe some, all, or none of a witness's testimony and that the U visa program's structure "could cause a witness to embellish his or her testimony in the hopes of being as helpful as possible to the prosecution." Id. at 1082 (quoting Romero-Perez, 492 S.W.3d at 906) (cleaned up).[22]

In contrast to the cases discussed above, in State v. Buccheri-Bianca, 312 P.3d 123, 126-27 (Ariz. Ct. App. 2013), the Court of Appeals of Arizona, Division 2, held that the trial court did not abuse its discretion in excluding evidence about the immigration status of a witness, who was a minor and an alleged victim of child molestation by the defendant. The Court observed that nothing in the record demonstrated that the witness or her family knew about the U visa program when the molestation was reported and pointed out that the witness did not get support from the State for a U visa application until nearly a year after the initial molestation allegations. See id. at 127. According to the Court, the length of time between the allegations and the filing of the U visa application supported the trial "court's conclusion that the possibility of obtaining a U-Visa was not relevant to [the

---

[22]Although the Court determined that the trial court erred, it was not necessary for it to engage in a harmless error analysis because it had already determined that the defendant was entitled to a new trial on a different ground. See Juan A. G.-P., 287 A.3d at 1084.

witness's] accusation." Id.[23]

Although the facts of <u>Valle</u>, <u>Del Real-Galvez</u>, <u>Romero-Perez</u>, <u>Dickerson</u>, and <u>Juan A. G.-P.</u> are not on all fours with those of this case, we agree with the holdings in the cases and conclude that the holdings are consistent with ours in <u>Calloway</u>, <u>Martinez</u>, and <u>Manchame-Guerra</u>.

## Application of the Above Principles

We now address the first two questions presented by Mr. Gonzalez. As we explained in <u>Manchame-Guerra</u>, 457 Md. at 318, 178 A.3d at 11, "[i]t would be difficult— and likely dangerous—to attempt to prescribe the minimum factual foundation that must be included in a Rule 5-616(a)(4) proffer[.]" With this in mind, as we did in <u>Manchame-Guerra</u> and other cases, we confirm that a proffer concerning the factual foundation is to be viewed from the perspective of the witness, *i.e.*, the question is whether the witness may

---

[23]In <u>People v. Villa</u>, 55 Cal. App. 5th 1042, 1044-45, 1052 (Cal. Ct. App. 2020), the Court of Appeal of California, Fourth District, concluded that the trial court did not abuse its discretion by excluding evidence that the victim had applied for a U visa because, even though the evidence was relevant, the victim testified at a preliminary hearing that she did not know about the U visa program when she gave a statement to law enforcement, and her trial testimony was the same, so "the probative value of the evidence [was] minimal, easily outweighed by the potential for wasted time and jury confusion." The Court concluded that,

> where an abuse victim has provided the same basic testimony about suffering abuse before and after learning of the U visa program, the probative force of the evidence she submitted an application for such a visa is significantly outweighed by the risks of prejudice to the victim and of confusing the jury and taking up undue trial time to explain the potential for bias.

Id. at 1054. The Court also determined that any error in exclusion of evidence that the victim was seeking a U visa was harmless because "the physical evidence of the abuse was overwhelming[.]" Id. at 1045.

have an expectation or a hope for a benefit in return for giving testimony favorable to the prosecution. See id. at 318, 178 A.3d at 11. We also reiterate the important principle that circumstantial evidence may be sufficient to establish the requisite foundation concerning the witness's hope or expectation of a benefit. See id. at 315, 178 A.3d at 9. And, although it is for a trial court to decide whether an adequate factual foundation has been established, issues of credibility concerning a witness's expectation of a benefit are for the trier of fact to resolve. See id. at 313, 178 A.3d at 8.

The nature of a U visa application and our case law interpreting Maryland Rule 5-616(a)(4) compel the conclusion that a witness's application for a U visa can, on its own, create a basis for cross-examination where the U visa application has been submitted on the witness's behalf on the ground that the witness is the victim of a crime that a defendant is on trial for. A U visa application submitted by a witness demonstrates that the witness is applying for a visa that confers a substantial benefit based on the requirement that the witness be helpful in the investigation or prosecution of criminal activity specified in the application. In signing a U visa application, under penalty of perjury, a petitioner attests: "I certify . . . that all of the information in my petition and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my petition, and that all of this information is complete, true, and correct." USCIS Form I-918, Petition for U Nonimmigrant Status at 8. It would be difficult to conclude that a defendant cannot question a witness about bias or an interest in the outcome of a case where the witness has submitted an application, under penalty of perjury, seeking the benefit of a visa on the basis that the witness will assist in the

investigation or prosecution of the defendant as a condition of obtaining the visa. And, where the requisite certification has been provided by a certifying official on the ground that the witness is assisting in the prosecution of the defendant's case, regardless of whether the witness has submitted the application, a sufficient factual foundation for impeachment of the witness under Maryland Rule 5-616(a)(4) has been established, as the witness has already received a benefit and has more than just a hope or expectation of such in exchange for testimony.

Given the substantial benefits that may be attained through a U visa and the structure of the U visa program, we fully agree with the Court of Appeals of Kentucky's statement that "[o]ne can readily see how the U-Visa program's requirement of 'helpfulness' and 'assistance' by the victim to the prosecution could create an incentive to" a victim hoping to have a U visa application granted. Romero-Perez, 492 S.W.3d at 906 (citation omitted). As that Court observed, even if a victim does "not outright fabricate the allegations against the defendant, the structure of the program could cause a victim to embellish her testimony in the hopes of being as 'helpful' as possible to the prosecution." Id. (citation omitted).

In Kazadi, 467 Md. at 52-53, 223 A.3d at 585, we concluded that allegations of additional circumstances beyond a "witness's status as an undocumented immigrant, or the existence of a deportation order to which the witness may be subject[,]" such as a *quid pro quo* relationship, are necessary to establish a factual foundation for cross-examination under Maryland Rule 5-616(a)(4). In other words, evidence that establishes a factual foundation of allegations of a *quid pro quo* arrangement between a witness and the State is sufficient to demonstrate a basis for cross-examination under Maryland Rule 5-616(a)(4).

To be sure, definitively establishing the existence of an actual *quid pro quo* relationship between a witness and the State through direct evidence of an agreement between the two would form the factual foundation for impeachment under Maryland Rule 5-616(a)(4). But, Kazadi does not stand for the proposition that a defendant is required to definitively establish the existence of a *quid pro quo* arrangement to establish a sufficient factual foundation for impeachment under Maryland Rule 5-616(a)(4) as to immigration matters.

Nor does our holding in Manchame-Guerra require that to establish a factual foundation for cross-examination of a witness under Maryland Rule 5-616(a)(4), a defendant must demonstrate the existence of a *quid pro quo* relationship or an actual agreement between the State and the witness. Instead, under Manchame-Guerra, 457 Md. at 318, 178 A.3d at 11, there must be a proffer that, when viewed from the witness's perspective, shows that the witness hopes or anticipates receiving a benefit in exchange for testimony. It is for the trier of fact to determine whether the witness's testimony is, in fact, being given in exchange for or in return for a benefit (or expected benefit) and whether the witness's testimony is, therefore, false or embellished as a result of the promised or anticipated benefit. See id. at 313, 178 A.3d at 8.

We conclude that Mr. Gonzalez's counsel established a sufficient factual foundation for impeachment of M. under Maryland Rule 5-616(a)(4) about her U visa application and that the circuit court erred in precluding cross-examination on this ground. Mr. Gonzalez's counsel proffered circumstances that could have caused a trier of fact to believe that M.'s testimony was affected by the expectation or hope of a benefit in return for testifying favorably for the State. Although M.'s U visa application was not made a part of the record,

during *voir dire*, M. testified that she filled out the supplement, *i.e.*, the certification, with her attorney, and signed it. The supplement does not require the signature of an applicant, but a reasonable inference from M.'s testimony is that she signed the U visa application itself. See USCIS Form I-918, Petition for U Nonimmigrant Status at 8.

At oral argument, the State acknowledged that M. had submitted a U visa application but argued that because the focus is on what the witness believes, more than submission of the application must be shown. In response to a question from the Court, the State argued:

> At its core, the facts that [Mr. Gonzalez] points to that support it are really just the existence of the certified application that [M.] submitted. Right? And, and, what we're saying is that that alone isn't enough. And, and what it might be that creates that nexus between credibility and the U visa might vary from case to [] case. But here he showed nothing other than the fact that with the benefit of counsel she submitted this U visa in connection with this case. And because the focus is on what the witness believes and what the witness expects, either through direct or circumstantial evidence, it's that additional circumstance, which is referred to in Manchame-Guerra.

M.'s testimony, however, was indicative of more than just the circumstance that a U visa application had been submitted on her behalf. During *voir dire*, M. acknowledged that she understood that she needed to be helpful to the prosecutor to be able to get a U visa, even though she couched her testimony in terms of: "If the attorney tells me." Based on M.'s testimony, a reasonable trier of fact could have concluded that M. knew she was seeking a U visa, a substantial benefit, on the condition that she would be helpful in the prosecution of Mr. Gonzalez's case and that this knowledge provided an interest in the outcome of the proceeding or a motive to testify falsely or to embellish her testimony.

Even without M.'s acknowledgment that she understood she had an obligation to be helpful to the prosecution, based on her having submitted the U visa application, a reasonable trier of fact could have inferred that she was aware of the requirement.

Significantly, Mr. Gonzalez also established that a member of the State's Attorney's Office, which was responsible for the prosecution of his case, had signed the certification for M.'s U visa application, attesting that M. was cooperating with the prosecution, and that M. knew that the State had approved the certification on her behalf. During *voir dire*, in answer to Mr. Gonzalez's question about whether she received a response from the State's Attorney's Office with respect to her U visa application, M. testified: "Of course. It has been accepted and approved." Although it is unclear whether M. meant only that her certification had been completed by a member of the State's Attorney's Office or that her U visa application had been accepted and approved, the circumstance that the certification was signed by the same office responsible for prosecuting Mr. Gonzalez's case is evidence that M. had already received a benefit in exchange for her promise to cooperate. Having applied for a U visa with a certification that had been approved by the prosecutor's office, M. risked having the State's certification being withdrawn and the visa not approved (or revoked, if it had been granted) if she failed to be helpful and cooperative with the prosecution.

In precluding impeachment of M., the circuit court credited M.'s testimony during *voir dire* "that she d[id]n't understand or d[id]n't know if there [were] any negative consequences for her failure to cooperate[.]" M. may or may not have been telling the truth when she indicated that she did not understand or know if there would be negative

consequences if she failed to cooperate or when she testified about other matters during *voir dire* concerning her U visa application. As Judge Eyler explained, M.'s "credibility" on such matters, "like other credibility determinations regarding her testimony, was a demeanor-based assessment for the jury, not the court, to make[,]" and the circuit court erred in concluding otherwise. Gonzalez, 2023 WL 5030170, at \*16 (Eyler, J., concurring).[24]

### Probative Value Versus the Danger of Undue Prejudice

Where a sufficient factual foundation for inquiry under Maryland Rule 5-616(a)(4) has been established, the trial court must engage in a balancing analysis similar to that required under Maryland Rule 5-403 to weigh the probative value of the inquiry against the danger of undue prejudice to the State or confusion. See Calloway, 414 Md. at 638, 996 A.2d at 881; Manchame-Guerra, 457 Md. at 321, 178 A.3d at 13. An appellate court reviews for abuse of discretion a trial court's determination as to whether evidence is inadmissible because the danger of undue prejudice substantially outweighs its probative value. See Montague v. State, 471 Md. 657, 673-74, 243 A.3d 546, 555 (2020).

We do not read the circuit court's ruling in this case, however, as demonstrating that the circuit court either implicitly or explicitly balanced the probative value of the inquiry

---

[24]We also agree with Judge Eyler that the circumstance that one year passed between the incident and M.'s attorney's April 23, 2021 letter to the State's Attorney's Office is not dispositive of whether an adequate factual foundation existed but rather is a "fact for the jury to consider in assessing M.'s credibility." Gonzalez, 2023 WL 5030170, at \*17 (Eyler, J., concurring). A jury could reasonably have inferred that, although the evidence did not establish precisely when M. actually applied for the U visa, the benefit of having or getting a U visa may have subsequently motivated her to lie or embellish her testimony. See id. (Eyler, J., concurring).

against the danger of undue prejudice or confusion. To be sure, in announcing its ruling, the circuit court stated that Mr. Gonzalez's counsel had not shown that cross-examination concerning M.'s "immigration status would be probative of her character trait for truthfulness[.]" Given that the circuit court found there was an insufficient factual foundation for impeachment of M., there was no need for the circuit court to address the second part of the analysis.[25]

Although both parties have discussed the issue in their briefs, whether the circuit court addressed the issue of the danger of undue prejudice and how it ruled on the matter was not explicitly raised as a question in the petition for writ of *certiorari*. This Court ordinarily refrains from deciding an issue that was not raised by a party in a petition for writ of *certiorari*. See Md. R. 8-131(b)(1). And, ordinarily an appellate court will not decide an issue unless it was raised in or decided by the trial court. See Md. R. 8-131(a). Given that we conclude that the error in precluding cross-examination of M. concerning her U visa application was harmless, it is unnecessary for us to deviate from our general practice of refraining from deciding an issue that was not decided by the trial court or raised in a petition for writ of *certiorari*.

---

[25]In the Appellate Court, only Judge Ripken interpreted the circuit court's ruling as having implicitly balanced the probative value of the inquiry against the danger of undue prejudice or confusion and concluded that the circuit court did not abuse its discretion. See Gonzalez, 2023 WL 5030170, *8-*9. Judge Friedman would not have reached the issue and Judge Eyler explained that, in her view, the circuit court had not engaged in a balancing analysis. See id. at *18 (Friedman, J., concurring); id. at *17 (Eyler, J., concurring). Judge Eyler also stated that, "had the [circuit] court determined that the probative value of the U-Visa evidence for impeachment was substantially outweighed by the danger of undue prejudice or confusion, it would have abused its discretion." Id. at *17 (Eyler, J., concurring).

**Harmless Error**

The convictions should be affirmed because the error was harmless beyond a reasonable doubt. "When an appellate court considers the State's argument that an error is harmless, the court conducts its own independent review of the record." Belton v. State, 483 Md. 523, 541, 295 A.3d 612, 622 (2023) (cleaned up). Under a harmless error analysis, "an appellate court does not reverse a conviction based on a trial court's error or abuse of discretion where the appellate court is satisfied beyond a reasonable doubt that the trial court's error or abuse of discretion did not influence the verdict to the defendant's detriment." Ford v. State, 462 Md. 3, 41, 197 A.3d 1090, 1112 (2018) (citation omitted). "The harmless error standard is highly favorable to the defendant, and the burden is on the State to show that the error was harmless beyond a reasonable doubt and did not influence the outcome of the case." Perez v. State, 420 Md. 57, 66, 21 A.3d 1048, 1054 (2011) (cleaned up).

In Dionas v. State, 436 Md. 97, 100-01, 118, 121, 80 A.3d 1058, 1060-61, 1071, 1072 (2013), a case markedly different from this one, where the defendant was convicted of second-degree murder, first-degree assault, and handgun offenses, we held that the trial court erred in limiting cross-examination of a State's witness who was an eyewitness to the shooting incident and the brother of one of the victims and that the error was not harmless. We stated that, in a criminal jury trial, the jury is the trier of fact, responsible for weighing the evidence and rendering a verdict, and, as such, "any factor that relates to the jury's perspective of the case necessarily is a significant factor in the harmless error analysis."

Id. at 109, 80 A.3d at 1066.[26] Citing Martin v. State, 364 Md. 692, 703, 775 A.2d 385, 391

(2001), a case in which there had been a complete denial of an opportunity to impeach the

a witness's credibility, we observed that, "where credibility is an issue and, thus, the jury's

assessment of who is telling the truth is critical, an error affecting the jury's ability to assess

a witness' credibility is not harmless error." Dionas, 436 Md. at 110, 80 A.3d at 1066.

And, we reiterated that the test we apply when assessing harmless error is whether "the

reviewing court can conclude beyond a reasonable doubt that the error in no way influenced

---

[26]In Dionas, 436 Md. at 101-02, 80 A.3d at 1061, the defendant sought to cross-examine the witness regarding an expectation of leniency—namely, the witness, who was charged with a violation of probation and was incarcerated, sought a continuance of the violation of probation hearing to testify at the defendant's trial and requested to be released on home detention pending the hearing. The presiding judge in the violation of probation case granted the request. See id. at 102, 80 A.3d at 1061. The defendant sought to cross-examine the witness about his motive to testify and whether the witness believed he would receive a benefit at his violation of probation hearing as a result of testifying for the State. See id. at 102-03, 80 A.3d at 1061-62.
        Following a three-and-a-half-day trial, the jury deliberated for five-and-a-half days. See id. at 103, 80 A.3d at 1062. On the first day of deliberations, the jury requested instruction as to first- and second-degree murder. See id. at 103, 80 A.3d at 1062. On the second day, the jury sent two more notes, the first note advised that the jury was unable to reach a unanimous verdict on any count and asked "[w]hat should we do at this point?" and the second note stated that the jury had deliberated to the best of its ability and could only agree on two counts. Id. at 103, 80 A.3d at 1062. On the fourth day, the jury submitted a note asking whether the use of a handgun in the commission of a crime of violence counts related to the enumerated victims. See id. at 103, 80 A.3d at 1062. On the fifth day, the jury sent two more notes, one asking what the consequences are for jurors who are not cooperating in deliberations and a second note from Juror # 9 stating: "I did not talk to no one about this case, I am being pick[ed] out. Some one that I do not know ask [sic.] me if we came to a verdict. My verdict did not match their verdict it made the count 11 to 1, on more than one count." Id. at 103-04, 80 A.3d at 1062 (brackets in original). In concluding that the trial court's error was not harmless, we explained that the jury's behavior during deliberations was a relevant factor in the harmless error analysis. See id. at 111, 115-16, 80 A.3d at 1066-67, 1069.

the verdict." Id. at 114, 80 A.3d at 1069 (quoting Dorsey v. State, 276 Md. 638, 659, 350 A.2d 665, 678 (1976)) (ellipsis omitted).

In reviewing for harmless error in this case, we are considering whether the circuit court's error in precluding cross-examination of M. about her U visa application influenced the verdict. Based on the evidence adduced at trial, we conclude beyond a reasonable doubt that the preclusion of cross-examination of M. concerning her U visa application did not influence the jury's verdict. While testifying on his own behalf, Mr. Gonzalez acknowledged committing acts that constituted second-degree assault, *i.e.*, grabbing M. and struggling with her in the kitchen (which resulted in a red mark on her neck), grabbing F. "in the neck area" and pushing him as he left the kitchen, and pushing M. in the hallway upstairs. Mr. Gonzalez's theory of the case was not that he had no physical contact with M. or F., but rather that M. and F. consented to being touched by involving themselves in an altercation and that he did not engage in conduct that constituted the more serious offenses of first-degree assault and child abuse. During closing argument, Mr. Gonzalez's counsel argued:

> That is another reason why [Mr. Gonzalez's] testimony is credible. He knows what he did because what he did was accurate. M[.] consented to being touched. That is one of the elements. . . . Just because you involve yourself in a physical altercation doesn't mean that you do not consent to being touched.
> M[.] and F[.] took steps to get involved, took steps to attempt to put hands on [Mr. Gonzalez]. They both consented to being touched.

Although Mr. Gonzalez's counsel argued consent as a defense, no specific jury instruction was requested or given defining consent. And, because Mr. Gonzalez's theory of the case did not include self-defense, no jury instruction on self-defense was requested

- 50 -

or given. The circuit court instructed the jury, using the Maryland Criminal Pattern Jury Instruction on second-degree assault, that, for the jury to convict Mr. Gonzalez of second-degree assault, the State was required to prove that Mr. Gonzalez "caused offensive physical contact with or physical harm to F[.] and M[.], that the contact was a result of an intentional or reckless act of [Mr. Gonzalez] and was not accidental, and that the contact was not consented to by F[.] and M[.] and not legally justified."

During deliberations, the circuit court received a note from the jury inquiring about the three counts of second-degree assault, asking that the court explain: "What specifically are the 3 counts[?]" and "Which of the 3 2nd degree counts apply to the 1 1st degree count[?]" After consulting with counsel, the circuit court responded in writing to the jury: "As to the 2nd degree assault, the State has alleged separate acts as to M[.] & F[.] You must rely on your memory as to the evidence of the separate acts." (Paragraph break omitted). That the jury acquitted Mr. Gonzalez of first-degree assault of M. and second-degree physical child abuse of F. demonstrates that the jury carefully considered the conduct constituting each offense and acquitted Mr. Gonzalez of the two more serious offenses that involved conduct that he did not acknowledge having engaged in. Although Mr. Gonzalez denied strangling or intending to kill M. or F., trying to abuse or be cruel to F., or that he intended to hurt M. or F., he acknowledged that he grabbed M. and struggled with her, grabbed F. near his neck, and pushed M. in the upstairs hallway. The logical inference is that the jury rejected the contention that M. and F. consented to being subject to the physical contact that constituted the three second-degree assaults. This determination did not rest on issues related to M.'s credibility but rather on the nature of

the evidence, common sense, and Mr. Gonzalez's own testimony, which established that he engaged in offensive physical contact with M. and F.

Even so, M.'s testimony was corroborated by F.'s. M. was not the sole witness to the events of the evening of March 13, 2020. M. and F. were both witnesses. There is no indication that Mr. Gonzalez sought to impeach F. under Maryland Rule 5-616(a)(4) about M.'s U visa application. Even if Mr. Gonzalez had been able to impeach M. by asking about her U visa application in the presence of the jury, the same inquiry would not have applied to F., whose testimony was consistent with M.'s.

Other evidence corroborated M. and F.'s testimony. F.'s emergency department medical records were admitted into evidence and showed that there was redness on the left side of F.'s neck. Photographs of bruises on F.'s neck were admitted into evidence as State's Exhibits 3 and 4. Photographs of M. that Nurse Barton took during her forensic examination of M. were also admitted into evidence. Nurse Barton testified that, during the forensic examination, she observed redness on M.'s neck and M. complained of neck pain. And, Detective McEvoy, one of the officers who responded to the location on March 13, 2020, testified that she witnessed M. grimace when she touched her neck and that, at points, M. was "holding her left arm[.]"

In addition, M.'s testimony at trial was consistent with her initial description of the incident. M. called 911 very shortly after the incident with Mr. Gonzalez. The Montgomery County Fire and Rescue Service responded to the location and its report, which was admitted into evidence, indicated that M. reported that Mr. Gonzalez was intoxicated, became aggressive, and physically assaulted her and F., and that she had been

placed in a chokehold and her head was banged against the wall. This mirrored M.'s testimony at trial.

In short, the impact of potential cross-examination of M. about her U visa application was undercut by the other evidence corroborating M.'s testimony, including F.'s testimony and the medical records, photographs, and other testimony that corroborated M.'s injuries. The trial lasted four days and the jury began deliberating after closing arguments, around lunch time on the last day, and reached a verdict the same afternoon. Other than a note advising that it had reached a verdict, the jury sent only the note discussed above. And, Mr. Gonzalez's own testimony confirmed that he engaged in the conduct that formed the basis of the crimes for which he was convicted.[27]

---

[27]In addition, at trial, during opening statements, Mr. Gonzalez's counsel gave an account of the events from Mr. Gonzalez's perspective, which was a preview of Mr. Gonzalez's testimony, and acknowledged that Mr. Gonzalez had engaged in conduct with M. and F. that formed the basis of the second-degree assaults. During opening statements, Mr. Gonzalez's counsel stated:

> [O]n this particular night, M[.] tried to slap [Mr. Gonzalez]. Now, I don't know about you, but I don't think anyone appreciates being slapped but, again, as you learn about Mr. Gonzalez himself that he tries to be very reserved but in order to avoid being slapped, he has to prevent someone from slapping him.
> So he grabbed M[.]'s wrists and pushed her back. F[.] saw his father grab his mom and I think naturally we would want to our kids to kind of stand up for us if they can. I get that. F[.] saw his father grab his mom and, mixed with the anger from earlier that afternoon, he went after his father. So this is no longer an altercation between mother and father. This is now an altercation between father, mother, and son. And F[.] at the time was not a slight child. He is a bigger kid and that's okay. He is roughly about the same size as his father. So [Mr. Gonzalez] is now going up against his wife and his child and all he wants to do is just get out of the house.

As Judge Eyler observed, "although [M.'s] impeachment may have affected the jury's assessment of whether [Mr. Gonzalez] committed first-degree assault and second-degree child abuse, the jurors found [him] not guilty of those crimes anyway." Gonzalez, 2023 WL 5030170, at *18 (Eyler, J., concurring). Based on M.'s and F.'s testimony, the evidence documenting their injuries, and Mr. Gonzalez's own testimony, the State has shown beyond a reasonable doubt that preclusion of cross-examination of M. concerning her U visa application did not influence the jury's verdict as to the second-degree assaults. Accordingly, we affirm the judgment of the Appellate Court of Maryland.

> **JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. PETITIONER TO PAY COSTS.**

---

> So, as he is struggling with his wife trying to avoid her slaps, F[.] comes in and he essentially shoves F[.] out of the way. [Mr. Gonzalez] leaves the space where was happening, goes into his room, grabs his shoes and as he is leaving the house, M[.] doesn't leave the house. Instead M[.] blocks him. It's a narrow hallway. She blocks him from leaving. So [Mr. Gonzalez] pushes past her to get out of the house there is only one way to get out through that hallway. Pushes past her and leaves. The cops arrive on the scene.
> . . . [A]nd so we have two very different stories about what happened on March 13.

In other words, Mr. Gonzalez's counsel's opening statement demonstrates that Mr. Gonzalez planned to testify and give his account of the incident regardless of any potential objection or ruling as to impeachment of M. about the U visa application, given that without first raising the issue, his counsel had already informed the jury of his side of the story.

IN THE SUPREME COURT

OF MARYLAND

No. 23

September Term, 2023

_____

ANTONIO E. GONZALEZ

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Watts,
Hotten,*
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Dissenting Opinion by Gould, J.

_____

Filed: May 29, 2024

* Hotten, J., participated in the hearing of the case, in the conference in regard to its decision, and in the adoption of the opinion as an active judge. She retired from the Court and was recalled to senior status prior to the filing of the opinion.

I join the part of the Majority's opinion that holds the trial court erred in precluding defense counsel from cross-examining M. about her U visa application, but I respectfully dissent to the Majority's harmless error analysis. In my view, the error was not harmless, and Mr. Gonzalez should be granted a new trial.

Under the harmless error doctrine, a trial court's error entitles the defendant to a new trial *unless* the reviewing court is satisfied beyond a reasonable doubt that the error "in no way influenced the verdict" and "that there is no reasonable possibility that the evidence complained of-whether erroneously admitted or excluded-may have contributed" to the guilty verdict. *Dorsey v. State*, 276 Md. 638, 659 (1976). In conducting the harmless error analysis, we must keep in mind that the jury "is responsible for weighing the evidence and rendering the final verdict." *Dionas v. State*, 436 Md. 97, 109 (2013). So "any factor that relates to the jury's perspective of the case necessarily is a significant factor in the harmless error analysis." *Id.* In *Dionas v. State*, as here, the trial court improperly limited the defendant's cross-examination of the State's witness concerning his motive to cooperate with the State. *Id.* at 100-01. In finding that the error was not harmless, we stated that "where credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a witness' credibility is not harmless error." *Id.* at 110.

Here, there can be no doubt that the trial court's error affected the jury's ability to assess the accuser's credibility. Indeed, that's the entire point of the Majority's substantive analysis—with which I agree—that the trial court erred in precluding Mr. Gonzalez from pursuing the U visa line of inquiry. Under *Dionas*, that error was not harmless.

Concluding otherwise, the Majority emphasizes that Mr. Gonzalez's testimony alone supported the guilty verdicts for the second-degree assault of both M. and her son, F. In addition, the Majority surveys the other evidence arrayed against Mr. Gonzalez, including F.'s corroborating testimony, which, the Majority confidently asserts, would not have been affected by any impeachment of M. about her U visa application. Maj. Op. at 52-53. The Majority relies on evidence found in medical records, photographs, and testimony from the treating nurse and the detective who responded to the incident, all of which were consistent with M.'s account. In other words, the Majority makes the mistake we warned against in *Dionas*, where we stated that "the proper inquiry upon applying the harmless error test is not a consideration of the State's evidence apart from [the witness's] testimony, but whether the trial court's error was unimportant in relation to everything else the jury considered in reaching its verdict." 436 Md. at 118.

In emphasizing the inculpatory nature of Mr. Gonzalez's testimony, the Majority assumes that Mr. Gonzalez would have testified even if the trial court had permitted him to cross-examine M. about her U visa application. This assumption is as ill-conceived as it is unwarranted. Ill-conceived because the State carries the burden of proof and the defendant has the constitutional right not to testify; unwarranted because but for the trial court's error, Mr. Gonzalez might not have waived that right.

The Majority fails to grapple with what the evidence from the State's case-in-chief might have looked like but for the error. If Mr. Gonzalez had been able to cross-examine M. on this issue, her credibility could have been fatally undermined. And while it's true that F. corroborated M.'s account, it is clear from both M.'s and F.'s testimony that F., aged

2

15, was protective of his mother. So, if the jury had concluded that M.'s account was not believable, it's not difficult to imagine that the jury could have likewise discounted the account of F., her loyal and protective son. Without credible testimony from M. and F., the State would have been left with pictures, medical reports, and testimony of the nurse and detective, none of which would have told the jury anything about the circumstances behind the injuries. Such an evidentiary picture is very different from the one Mr. Gonzalez faced when he chose to waive his right not to testify.

As would any defendant, Mr. Gonzalez decided whether to testify based on the state of the evidence as it existed when the State rested. Had that evidentiary picture been less favorable to the State, Mr. Gonzalez might have chosen not to testify, thereby depriving the jury of the key evidence on which the Majority hangs its harmless error analysis. In other words, the inculpatory nature of Mr. Gonzalez's testimony weighs *against* a finding of harmless error, not in favor of it.[1] The Majority has it backward.

We have previously recognized that an error may not be harmless if it affects a defendant's decision to testify. *State v. Jordan*, 480 Md. 490, 513 (2022). In *Jordan*, we recognized that the trial court's error may have led the defendant to choose to testify when she otherwise might have chosen not to, but we found that the error was harmless because we were satisfied that, on the sole count for which she was found guilty, her testimony was not inculpatory. *Id.* at 515 ("At worst, therefore, the jury declined to credit her denial of

---

[1] *See Dionas*, 436 Md. at 120 ("The petitioner's proffered cross-examination . . . would not have provided further evidence of petitioner's guilt. Instead, the cross-examination would have challenged the credibility of the identification testimony supporting the State's theory of the crime.").

hitting [the victim], which is a far cry from providing evidence tending to establish her guilt.").[2] In my view, we should presume that had he been permitted to effectively impeach M.'s credibility, Mr. Gonzalez would have weighed differently the pros and cons of testifying. Given the constitutional dimension of that choice, that is reason enough to follow the general principle that errors "affecting the jury's ability to assess a witness' credibility" are not harmless.[3] *See Dionas*, 436 Md. at 110.

---

[2] In *Jordan*, during *voir dire*, the trial court refused the defendant's request to ask the prospective jurors if they would be unwilling to comply with a jury instruction on the defendant's right not to testify. When the trial court made this ruling, we had not yet decided *Kazadi v. State*, 467 Md. 1 (2020), which held that "on request, during *voir dire*, a trial court must ask whether any prospective jurors are unwilling or unable to comply with the jury instructions on the fundamental principles of presumption of innocence, the State's burden of proof, and the defendant's right not to testify." *Jordan*, 480 Md. at 493, 505 (quoting *Kazadi*, 467 Md. at 9).

The parties agreed that the failure to ask the question was an error, and the issue before this Court was whether that error influenced the verdict. We noted that this type of error "could have been the deciding factor in the defendant's decision to testify." *Id.* at 513. That is, a defendant may have a good reason not to testify (e.g., to avoid impeachment with a prior conviction), but may nonetheless decide to testify out of concern the jury could "see [the defendant's] failure to testify as evidence of guilt[.]" *Id.* Although we found that the error was harmless, we did so only after carefully evaluating all the trial testimony to confirm that the defendant's choice to testify did not detrimentally influence the verdict. *Id.* at 514-16.

[3] The Majority's discussion of *Dionas* is an exercise of misdirection. *First*, the Majority notes that the Court in *Dionas* cited *Martin v. State*, 364 Md. 692 (2001), for the proposition that "where credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a witness' credibility is not harmless error." *Dionas*, 436 Md. at 110. The Majority then says that *Martin* involved a "complete denial of an opportunity to impeach a witness's credibility[.]" Maj. Op. at 49. Presumably, the Majority is implying that to be harmless, the denial of the right to impeach the credibility of a witness must be complete. That is clearly not correct—if a defendant has multiple reasons to lie, it cannot be the case that a denial of the right to impeach is reversible *only* if the defendant was denied the right to cross-examine about each reason.

4

For these reasons, I respectfully dissent in part.

---

In any event, the Majority does not explain how the denial here was not complete. Other than the U visa issue, I am not aware of any other line of inquiry available to Mr. Gonzalez to show that M. had a motive to embellish or lie.

*Second*, the Majority recounts the jury's lengthy and extensive deliberations and proclivity for sending notes in *Dionas*. From that, the Majority notes that, in *Dionas*, "we explained that the jury's behavior during deliberations was a relevant factor in the harmless error analysis." Maj. Op. at 49 n.26 (quoting *Dionas*, 436 Md. at 111, 115-16). The Majority does not explain how this statement supports its finding that the error was harmless. If anything, this point favors Mr. Gonzalez's argument that the error was not harmless.

Indeed, citing *Dionas*, Mr. Gonzalez argues that the jury's note asking for clarification on the elements of the assault weighs against a finding of harmless error because it indicates that "the jury was grappling with [the assault counts] and did not simply assume Mr. Gonzalez was guilty of them." And Mr. Gonzalez's embrace of *Dionas* for this proposition is not unwarranted. In *Dionas*, we noted that a lengthy deliberation could indicate that the jury was struggling and therefore could weigh against a finding of harmless error. So, we disagreed with the Appellate Court of Maryland, which concluded that lengthy deliberations indicated the jury's conscientiousness and therefore did *not* weigh against a finding of harmless error. *Dionas*, 436 Md. at 105-06. We explained that the lengthy deliberations could indicate that the jury was both struggling *and* deliberating conscientiously—that the two are not mutually exclusive—and thus could weigh against a harmless error finding. And, of course, in *Dionas* we found that the curtailment of the defendant's right to impeach the witness was *not* harmless error. *Id.* at 120-21.

5

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/23a23cn.pdf